1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   ROBIN LUKIANCZYK,                No. 2:20-cv-00223-WBS-CKD

13              Plaintiff,

14        v.                          MEMORANDUM AND ORDER;
                                      FINDINGS OF FACT AND
15   UNUM LIFE INSURANCE COMPANY OF   CONCLUSIONS OF LAW PURSUANT
     AMERICA; SAGEWELL HEALTHCARE     TO FED. R. CIV. P. 52(a)
16   BENEFITS TRUST, and DOES 1
     through 10, inclusive,

17
                Defendant.
18

19

20                          ----oo0oo----

21        Plaintiff Robin Lukianczyk ("plaintiff") brought this

22   action against defendant Unum Life Insurance Company of America

23   ("Unum" or "defendant")[1] alleging she was wrongly denied long-

24   term disability benefits under her employer's group benefit plan

25   in violation of the Employee Retirement Income Security Act,

26   _____
             [1]    Sagewell Healthcare Benefits Trust was dismissed as a
27   defendant in February 2020.  (Docket No. 10.)  No Doe defendants
     have been added or identified.  Accordingly, the court will treat
28   Unum as the sole defendant.

1   ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  (Compl. (Docket No. 1).)

2   Both parties agreed to a bench trial under Federal Rule of Civil

3   Procedure 52 and submitted trial briefs.  (Docket Nos. 25, 27,

4   29, 30.)  This memorandum and order constitute the court's

5   findings of fact and conclusions of law pursuant to Federal Rule

6   of Civil Procedure 52(a).

7   I.   Factual & Procedural Background

8          Plaintiff worked as a Staff Accountant at Rady

9   Children's Hospital, beginning in 2007.  (See Admin. Rec.

10  ("A.R.") at 2-7.)  As a staff accountant, plaintiff performed

11  financial reporting functions in accordance with generally

12  accepted accounting principles, collected information necessary

13  to prepare monthly journal entries and account reconciliations,

14  monitored general ledger account activity, reconciled general

15  ledger accounts and reviewed, and investigated and corrected

16  inconsistent financial entries in documents and reports.  (See

17  id. at 70-75.)  The job was primarily sedentary but required

18  occasional lifting, carrying, pushing and pulling up to 10

19  pounds.  (See id. at 14; 74.)  Plaintiff was required to "make

20  judgments, deal with others, reach conclusions consistent with

21  accounting procedures," (id. at 14), analyze and solve problems,

22  anticipate customer needs, be available to work on a consistent

23  and timely basis, and use her own and other's time efficiently.

24  (See id. at 71-73.)

25         Plaintiff has a lengthy and complex medical history

26  that includes being diagnosed with chronic rheumatoid arthritis

27  in 2002, (see id. at 13), sleep difficulties such as obstructive

28  sleep apnea, insomnia, and hypersomnia dating back to at least

2012 (see id. at 269, 1057), and chronic fatigue syndrome that
dates back to at least 2013.  (See id. at 317.)  Plaintiff also
had a gastric bypass in 2001, (see id.), gallbladder removal
surgery in 2004 (see id. at 1260), and appendix cancer that was
located during a hysterectomy in 2010.  (See id. at 316.)

   A. Unum Group Long Term Disability Policy

    Unum issued a Group Long Term Disability ("LTD") Policy
("the Policy") No. 215793-028, effective July 1, 2014, to
Sagewell Healthcare Benefits Trust for the benefit of plaintiff's
employer, Rady Children's Hospital – San Diego.  (See id. at 116–
65.)  Plaintiff received coverage under the Policy.  (See id.)
Coverage under the Policy ends, among other reasons, "the date
you no longer are in an eligible group" or "the last day you are
in active employment except as provided under the covered leave
of absence provision."  (Id. at 132.)  "Active employment" under
the Policy means "that you are working for your Employer for
earnings that are paid regularly and that you are performing the
material and substantial duties of your regular occupation."
(Id. at 149.)  Employees must be working at least 36 hours per
pay period to fall into the category of "active employment."
(Id. at 119.)

    Benefits under the Policy become payable after a 180-
day elimination period during which the claimant must be
continuously unable to work.  (See id. at 134.)  Unum will treat
the claimant's disability as continuous if the disability stops
for 90 days or less during their elimination period and the days
that the claimant is not disabled do not count towards the
elimination period.  (See id.)  In relevant part, the plan

defines "disability" as:

> You are disabled when Unum determines that you
> are limited from performing the material and
> substantial duties of your regular occupation due
> to your sickness or injury; and you have a 20% or
> more loss in your indexed monthly earnings due to
> the same sickness or injury.  After 24 months of
> payments, you are disabled when Unum determines
> that due to the same sickness or injury, you are
> unable to perform the duties of any gainful
> occupation for which you are reasonably fitted by
> education, training or experience.  You must be
> under the regular care of a physician in order to
> be considered disabled.

(Id.)

Although "regular occupation" means the occupation plaintiff routinely performed before her disability began, in its review Unum looks at "[plaintiff's] occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (Id. at 152.)  The Policy also provides that benefits will stop, and the claim will end during the first 24 months of payments when "you are able to work in your regular occupation on a part-time basis, but you do not."  (Id. at 140.)

B.   Submission of Claim and Initial Review by Unum

Plaintiff stopped working full-time on April 28, 2017. (See id. at 5; 35.)  She applied for and received state disability benefits shortly thereafter.  (Id. at 537.)  Nearly a year later, on April 10, 2018, plaintiff submitted a claim for long term disability to Unum.  (See id. at 36-40.)  Plaintiff informed Unum that she had been unable to work since April 28, 2017 as a result of her rheumatoid arthritis, chronic fatigue syndrome, sleep disorders, and a generalized anxiety disorder.

4

1   (See id.)  Plaintiff stated that these diagnoses and symptoms

2   left her unable to maintain productivity at the level expected by

3   management, increased her anxiety, left her unable to concentrate

4   and use the keyboard for a long period and caused her to have to

5   call out of work excessively. (See id. at 37.)  Plaintiff

6   informed Unum that her treating physicians were her primary care

7   physician, Dr. Karen Jamison (internal medicine), Dr. Katherine

8   Nguyen (rheumatology), and Dr. Lisa Shives (sleep medicine).

9   (See id. at 38.)  She also provided Unum with a list of her

10  medications. (See id.)

11          Plaintiff submitted an Attending Physician Statement

12  ("APS"), prepared by Dr. Jamison, dated March 28, 2018.  (See id.

13  at 46-48.)  In this statement, Dr. Jamison stated that plaintiff

14  was "unable to stay awake for more than two hours at a time on an

15  intermittent basis due to [her] problems" and that she was

16  "unable to operate computer, manage staff, [and] heavy

17  machinery." (Id. at 48.)  Dr. Jamison stated that the duration

18  of these physical restrictions and limitations was "from April

19  28, 2017 to June 1, 2018." (Id.)

20          On April 13, 2018, Unum acknowledged receipt of

21  plaintiff's long term disability claim via email.  (See id. at

22  62.)  After receiving plaintiff's claim, Unum conducted a search

23  of plaintiff's social media presence.  (See id. at 88-105.)  Unum

24  interviewed plaintiff on April 30, 2018.  (See id. at 167-74.)

25  Plaintiff told Unum that she stopped working because of chronic

26  fatigue and rheumatoid arthritis.  (See id. at 167.)  She

27  reported that by the time she stopped working, her "fatigue had

28  gotten so bad that by the end of the week [her] concentration and

                                    5

memory was shot." (Id. at 168.)  Plaintiff reported that after
she initially stopped work in April 2017, she returned to work
briefly for 20 hours a week in July 2017.  (See id. at 167.)  Her
employer then decided that it would be best served if it did not
accommodate her part-time and suggested that she stay out of work
through December.  (See id.)  Plaintiff reported that she did not
return in December because the chronic fatigue and rheumatoid
arthritis did not improve.  (See id.)

In the interview with Unum, plaintiff also discussed a
recent cruise to Mexico that she had gone on for her husband's
birthday, explaining that she had gone on excursions but slept a
lot and alternated days for activity with rest days.  (See id. at
168.)  Plaintiff also reported that she was able to get up if she
had errands to run.  (See id. at 171.)  She stated that she would
drop off and pick up her grandson for school a couple days a
week.  (See id.)  Plaintiff reported that she would need to sleep
for two to four hours after dropping off her grandson at school
and would sometimes nap again after picking him up.  (See id.)
Following this interview, Unum proceeded with its review of
plaintiff's claims by ordering and receiving copies of her
medical and pharmacy records.  (See generally id. at 240-368,
372-412, 431-443, 515-534, 563-729, 888-916, 924-934.)

1.   Medical Records from Dr. Karen Jamison

Unum received medical records from Dr. Jamison ranging
from October 2016 to March 2018.  (See id. at 372-412.)  Dr.
Jamison's records from the plaintiff's visit on April 28, 2017
indicate that plaintiff was on bereavement leave because of the
recent death of her father in-law.  (See id. at 396.)  Dr.

1    Jamison initially put plaintiff on medical leave from April 20,

2    2017 to June 14, 2017 to allow for plaintiff's new sleep

3    medications to work.  (See id.)  In Dr. Jamison's records from

4    plaintiff's follow-up visit on June 28, 2017, she noted that

5    plaintiff reported that she felt that her rheumatoid arthritis

6    was flaring up, that she was still extremely fatigued, and that

7    she feared going back to work because she could not stay awake

8    for more than four hours at a time.  (See id. at 393-95.)  Dr.

9    Jamison noted that plaintiff was able to recently drive to Las

10   Vegas and then Utah "without any difficulty."  (Id.)  Rather than

11   continue her medical leave, Dr. Jamison convinced plaintiff to

12   "compromise" and return to work part-time until she could see a

13   new sleep specialist.  (Id. at 395.)

14        On November 1, 2017, plaintiff saw Dr. Jamison for a

15   follow-up visit.  (See id. at 387.)  Plaintiff reported that she

16   was scheduled to return to full-time work after December 31, 2017

17   because there was no part-time option for her.  (See id.)

18   Plaintiff reported that she had finally seen a new sleep

19   specialist and that she had not started Orencia, which had been

20   ordered by her rheumatologist.  (See id.)  Dr. Jamison wrote that

21   if plaintiff were to be put on permanent disability, it would

22   "likely need to come from the sleep specialist or psychiatrist."

23   (Id. at 388.)

24        At plaintiff's annual physical on December 13, 2017,

25   Dr. Jamison reported that plaintiff "finds that if she does any

26   activity for a couple of days, she is so profoundly tired, she

27   has to sleep for a few days."  (Id. at 381.)  Plaintiff also

28   complained of difficulty concentrating.  (See id. at 384.)

7

1  Plaintiff reported being exhausted after traveling to Las Vegas
2  for her daughter's wedding and being unable to do any housework
3  because of her fatigue.  (See id.)  Plaintiff requested that Dr.
4  Jamison put her out on permanent disability.  (See id. at 382.)
5  Dr. Jamison agreed to extend plaintiff's temporary disability
6  until they could further evaluate but informed plaintiff that she
7  "felt more comfortable with her being put out on disability by
8  the specialist for fatigue."  (Id. at 383.)

9        On March 28, 2018, Dr. Jamison extended plaintiff's
10  temporary disability to June 1, 2018 and noted in her records
11  that "it is likely that patient will need to go out on permanent
12  disability."  (Id. at 376.)  Dr. Jamison also stated that she
13  believed that most of plaintiff's "diagnoses are treatable and
14  should respond hopefully to regular medications as well as
15  regular diet."  (Id. at 375.)  Dr. Jamison noted plaintiff's
16  frustration that her rheumatologist and sleep disorder physicians
17  had not wanted to put her on permanent disability but stated that
18  she believed "it was best that [plaintiff] was evaluated by a
19  disability physician rather than being put out [on disability] by
20  myself."  (Id. at 376.)

21        Despite Dr. Jamison's apparent reluctance to put
22  plaintiff on permanent disability, Dr. Jamison completed an APS
23  during that same visit.  (See id. at 46-48.)  In this statement,
24  Dr. Jamison stated that plaintiff was "unable to stay awake for
25  more than two hours at a time on an intermittent basis due to
26  [her] problems" and that she was "unable to operate computer,
27  manage staff, [and operate] heavy machinery."  (Id. at 48.)  Dr.
28  Jamison stated that the duration of these physical restrictions

8

1   and limitations was from "April 28, 2017 to June 1, 2018." (Id.)

2                    2.   Additional Medical Records Submitted to UNUM

3               Unum also received records from Dr. Katherine Nguyen,

4   Ms. Lukianczyk's treating rheumatologist spanning the period from

5   2015 to 2018. (See id. at 888–916.)  Dr. Nguyen had previously

6   reduced plaintiff's work schedule to 30 hours per week "due [to]

7   other fatigue." (See id. at 410.)  On July 18, 2017, plaintiff

8   saw Dr. Nguyen and reported that her joint tenderness and

9   swelling had worsened and that her fatigue was intensifying.

10  (See id. at 892.)  Dr. Nguyen reported that plaintiff's

11  shoulders, knees, elbows, and ankles were all within normal

12  limits.  (See id.)  She noted no tenderness or deformity in

13  plaintiff's hands or feet.  (See id.)  Dr. Nguyen also stated

14  that plaintiff's C-reactive protein, complete blood count, and

15  comprehensive metabolic panel were also all within normal limits.

16  (See id.)  Dr. Nguyen did note that plaintiff's Clinical Disease

17  Activity Index ("CDAI") was 22. (See id.)  She prescribed

18  plaintiff Orencia to treat her rheumatoid arthritis.  (See id. at

19  893.)

20              Plaintiff saw Dr. Nguyen again on February 1, 2018.

21  (See id. at 899.)  Dr. Nguyen noted that fatigue was the

22  plaintiff's most disabling symptom, that plaintiff reported that

23  she was unable to maintain her energy and concentration, and that

24  she had a hard time with repetitive use of her fingers and could

25  not stand long enough due to pain in her ankles and feet.  (See

26  id.)  Plaintiff stated that she had been unable to start the

27  Orencia prescribed in July 2017 because she was out of town and

28

1  had problems coordinating with the pharmacy.  (See id.) [2]

2         Unum also received medical records from multiple sleep

3  specialists who treated plaintiff.[3]  Plaintiff saw Dr. Malik,

4  board certified in neurology, clinical neurophysiology, and sleep

5  disorders, three times between December 2016 and July 2017.  In

6  2016 and 2017, Dr. Malik encouraged plaintiff to take scheduled

7  naps at work to reduce her daytime sleep deficit.  (See id. at

8  1030.)  Dr. Malik also performed a Multiple Sleep Latency Test

9  ("MSLT") on plaintiff in March 2017.  Plaintiff's mean sleep

10 latency increased to 12.2 minutes during this evaluation as

11 compared to 1.4 minutes when she was tested with Dr. Dahi in

12 2013.  (A.R. at 1057-58.)  On June 6, 2017, plaintiff saw her

13 sleep specialist Dr. Malik for evaluation of "chronic daytime

14 somnolence and fatigue."  (Id. at 1035.)  He noted that she was

15 on a leave of absence from work and that she napped at least once

16 a day for up to two to four hours.  (See id.)  Dr. Malik

17 indicated that her memory, attention, span and concentration were

18 sufficient and that her physical and neurological exams were

19 within normal limits.  (See id. at 1035-36.)

20         On October 18, 2017, plaintiff sought a second opinion

21 from Dr. Lisa Shives, a specialist in sleep medicine, who noted

22 _____

23        [2]    Unum additionally received a normal Cardio Pulmonary
   Exercise Test from Dr. Peter Marcos on March 23, 2018.  (See id.
24 at 430-43.)  Dr. Marcos did not provide any restrictions or
   limitations.  (Id.)
25

26        [3]    In addition to Dr. Shives and Dr. Malik, Unum Life also
   received records from Dr. Houman Dahi, a sleep specialist who
27 treated plaintiff from 2012 to 2016.  (See id. at 240-369.)  Dr.
   Dahi did not provide any specific work restrictions and
28 limitations or disability certification during that period.  (Id.)

1   that plaintiff reported "having cognitive difficulties, memory

2   loss, word finding difficulties, lack of concentration, and has

3   had to take a leave of absence due to these difficulties."  (Id.

4   at 925.)  Dr. Shives' physical examination of the plaintiff noted

5   no swelling, edema, or weakness, normal motor strength and gait,

6   and that patient presented as alert and oriented.  (See id. at

7   925–28.)

8                   3.   UNUM Review of Plaintiff's Claim

9             On June 28, 2018, plaintiff's claim was discussed by a

10   four-person Unum "round table" that included Director/AVP Jonah

11   Lee, Disability Benefit Specialist Elizabeth Brown, Clinical

12   Representative/ Nurse Stacy Bennett and Vocational Representative

13   Deborah Maxcy.  (See id. at 945–46.)  The round table discussed

14   that, despite her symptoms, plaintiff had traveled to Las Vegas

15   for her daughter's wedding and went on a cruise for her husband's

16   birthday.  (See id.)  The round table ultimately determined that

17   plaintiff's capacity was unclear.  (See id.)

18             In July 2018, Unum asked Nurse Bennett to review

19   plaintiff's medical records and offer an opinion as to whether

20   they supported plaintiff's claim that her medical problems

21   prevented her from performing the duties of her occupation.  (See

22   id. at 957–58.)  Nurse Bennett stated that it was unclear, and

23   that plaintiff's ailments appeared to be "very chronic in nature

24   with no significant change noted in symptoms, exams, diagnostic

25   findings or with treatment when compared to records on file from

26   sleep medicine from 2013-2016."  (Id. at 963.)  Nurse Bennett

27   also noted that plaintiff had not filled any prescriptions used

28   to treat insomnia or sleep symptoms since late 2017, (see id. at

                                    11

962), and that plaintiff had not refilled her pain medications frequently despite claiming use of them multiple times a day for pain.  (See id.)  Nurse Bennett recommended physician review of the claim.  (See id.)

In September 2018, Unum had its on-site physician ("OSP") Dr. Andrea Brown, a specialist in family medicine, review plaintiff's file.  (See id. at 1068-75.)  Dr. Brown concluded that the clinical basis for the restrictions and limitations that Dr. Jamison had imposed on plaintiff was unclear.  (See id.)  Dr. Brown noted that plaintiff's severe debilitating fatigue appeared chronic with no apparent change in symptoms, exams, polysomnography or treatment compared to her records from 2013 to 2016 and that her MSLT results actually appeared improved.  (See id.)  Following her evaluation, on September 26, 2018, Dr. Brown wrote to Dr. Jamison to express her conclusion that plaintiff would be able to perform the occupational demands of her job full time and inquired whether Dr. Jamison agreed.  (See id. at 1068-70.)

On October 4, 2018, Dr. Jamison returned the form sent to her by Dr. Brown and checked a box that stated that she agreed that plaintiff would be able to perform her occupational demands on a sustained full-time basis as of April 28, 2017 and beyond.  (See id. at 1074.)  After reviewing Dr. Jamison's letter, Dr. Brown and a Unum Quality Control consultant determined that long term disability payments were not payable.  (See id. at 1086-90.)  Unum communicated its denial of benefits to plaintiff by letter on October 12, 2018, citing Dr. Jamison's opinion that plaintiff could return to work, the fact that plaintiff had not followed up

1    with several physicians and refilled prescriptions, and that

2    plaintiff's recent vacations and care of her grandchild were

3    incongruous with the severity of symptoms she claimed.  (See id.

4    at 1104-10.)

5        B.   Plaintiff's Appeal of UNUM Denial

6            Plaintiff informed Unum that she would be appealing the

7    denial decision by letter on April 8, 2019.  (See id. at 1132.)

8    In support of her appeal, plaintiff submitted additional medical

9    records and statements from her treating physicians.  (See id. at

10   1166-1549.)  Plaintiff and her husband also submitted detailed

11   letters explaining how her pain and fatigue prevented her from

12   working and offering context to the trips that Unum argued were

13   evidence that she could return to work full time.  (See id. 1283-

14   87.)

15           On September 3, 2019, Dr. Jamison wrote to Unum to

16   "clarify her affirmative response to Unum's question posted in

17   the letter dated September 26, 2018."  (Id. at 1282.)  Dr.

18   Jamison stated that she "approached the question of whether there

19   was objective evidence to support her disability" not whether

20   plaintiff was actually disabled.  (Id.)  Dr. Jamison wrote that

21   plaintiff's "primary symptom for [her] conditions is fatigue, and

22   it is fatigue that [she] asserts prevents a return to work."

23   (Id.)  Dr. Jamison stated that there was "no way to obtain

24   objective evidence of fatigue, other than MSLT testing, which is

25   ordered and administered by her sleep specialist."  (Id.)

26   Jamison stated that she felt she was "unable to offer an opinion

27   regarding [plaintiff's] disability" and deferred to plaintiff's

28   other treating physicians.  (Id.)  Dr. Jamison stated that if

1  plaintiff's other treating physicians "believe that she is

2  disabled, and unable to return to work, I have no reason to

3  dispute or disagree with those conclusions." (Id.)  Dr. Jamison

4  also stated that she had "no reason to disbelieve [plaintiff's]

5  long-reported complaints of chronic fatigue." (Id.)

6       Plaintiff also submitted new letters and records from

7  her rheumatologists.  On December 12, 2018, Dr. Nguyen wrote that

8  plaintiff reported severe episodes of fatigue, that she was not

9  able to do much, had recent rheumatoid arthritis flareups and had

10 "not worked for a long time due to fatigue, inability to

11 concentrate and processing information." (Id. at 1565.)

12 However, Dr. Nguyen also noted that plaintiff's "pain and fatigue

13 are moderate." (Id.)

14       On August 21, 2019, Dr. Quyen Huynh, a specialist in

15 rheumatology, stated that she had been treating plaintiff since

16 February 2019 after a referral from Dr. Nguyen. (See id. at

17 1280-81.)  Dr. Huynh noted that plaintiff's reports of pain were

18 consistent with her examinations and diagnoses and opined that

19 plaintiff was "disabled and unable to perform the substantial and

20 material duties of her occupation or any occupation based on the

21 condition of her rheumatoid arthritis and chronic fatigue

22 syndrome." (Id. at 1280-81.)  Dr. Huynh also noted that

23 plaintiff "only recently started on Orencia after [a] prolonged

24 period of awaiting insurance approval and appeals." (Id.)  Dr.

25 Huynh's records from March and April 2019 reflected that

26 plaintiff had very active synovitis (swelling of the joints) and

27 that plaintiff reported that she could not sleep because of her

28 rheumatoid arthritis pain. (See id. at 1401-07.)

On September 12, 2019, Dr. Dahi stated that he had treated plaintiff since 2013, and that even then she "reported excessive daytime sleepiness, excessive daytime fatigue, morning headaches, difficulty staying awake to drive, inability to concentrate, difficulty initiating sleep and sleepiness even after increased sleep." (Id. at 1298.)  Dr. Dahi stated that "[plaintiff] reports that her fatigue, attention and concentration problems prevent her from working, and I have no reason to disbelieve her, as these reports can be related to her medical conditions." (Id.)

Plaintiff also submitted a functional capacity evaluation and a detailed vocational review. (See id. at 1248–79.)  Plaintiff engaged Smita D. Mistry, an occupational therapist who is trained and specialized in performing functional capacity evaluations to perform such an evaluation and prepare a report. (See id.)  Ms. Mistry opined that plaintiff could not perform the duties of her own occupation or any occupation. (See id.)  Plaintiff also engaged Charles Galarraga, MS, to prepare a vocational file review with labor market data. (See id. at 1352–85.)  Mr. Galarraga concluded that "claimant could not perform the duties of her own occupation or any occupation due to the restrictions and limitations of the attending physician and the functional capacity evaluation." (Id. at 1384.)  Mr. Galarraga spoke with twelve different potential employers and concluded that plaintiff "would not be considered for hire due to her issues with fatigue causing her inability to maintain attention and concentration throughout the day" and because her inability to sit for more than four hours a day precludes work in a

1  sedentary occupation.  (Id.)

2    On October 21, 2019, Unum held a forum and discussed
3  plaintiff's attorney's request for an independent medical
4  examination on appeal.  (See id. at 1552-53.)  Unum determined
5  that the request for an independent medical examination should be
6  declined because an examination in 2019 could not assess
7  plaintiff's condition for the relevant time period between April
8  28, 2017 and October 24, 2017.  (See id.)

9    Plaintiff's appeal was instead sent to another of
10  Unum's on-site physicians Dr. Chris Bartlett, a family medicine
11  specialist, for medical review and opinion.  (See id. at 1593-
12  1600.)  Dr. Bartlett stated that there was no indication that any
13  physician advised plaintiff to stop working in April 2017.  (See
14  id. at 1596.)  He noted that plaintiff did not have an increased
15  escalation of rheumatology appointments in 2017, as one might
16  expect based upon an exacerbation of rheumatologic symptoms.
17  (See id.)  Dr. Bartlett also noted that plaintiff reported severe
18  fatigue and sleepiness for years and that her test results had
19  not appeared to change much before and after she ceased working.
20  (See id.)  Dr. Bartlett observed that the April 12, 2018
21  cardiopulmonary stress test indicated that plaintiff retained
22  light to sedentary work capacity.  (See id.)  He also stated that
23  while Dr. Jamison was concerned about possible behavioral health
24  issues, plaintiff did not follow up on the recommended referral
25  for such testing (see id.), and did not fill her rheumatologist's
26  prescription for Orencia.  (See id. at 1597.)[4]  Dr. Bartlett

27  
28     [4]  Plaintiff contends that the reason that she did not
fill all of her prescriptions or immediately follow through with

1  noted that there was data suggesting that plaintiff's rheumatoid

2  arthritis symptoms had gotten worse in 2019 than they had been in

3  2017.  (See id.)  Dr. Bartlett also believed that plaintiff's

4  activity in driving long distances and caring for her grandchild

5  was inconsistent with her claimed inability to work.  (See id.)

6  Dr. Bartlett also noted that plaintiff's Social Security

7  Disability Insurance ("SSDI") petition had been denied by the

8  Social Security Administration.  (See id. at 1595-1600.)

9         On November 14, 2019, Dr. Bartlett wrote to Dr. Dahi

10 asking whether he agreed with Dr. Bartlett that plaintiff had the

11 ability to return to work.  (See id. at 1605-07.)  Dr. Dahi

12 disagreed and stated that "due to hypersomnia, it seems

13 [plaintiff] has deterioration in her cognitive function,

14 accounting, etc."  (Id. at 1620-22.)  On December 3, 2019, Dr.

15 Bartlett conducted a further review and noted that Dr. Dahi's

16 response did not change his opinion because Dr. Dahi did not

17 provide any supporting information of deterioration or cognitive

18 function.  (See id. at 1625-27.)  Dr. Bartlett also noted that

19 although Dr. Dahi knew that plaintiff drove and cared for her

20 grandson, he did not contact the Department of Motor Vehicles or

21 Child Protective Services with any concerns.  (See id.)  Dr.

22 Bartlett also noted that Dr. Dahi did not explain why plaintiff's

23 Epworth Sleepiness Scale remained unchanged in 2017 when compared

24 _____

25 referrals to other doctors was due to problems with her insurance
   and an inability to pay out-of-pocket for such care when she was
26 not working.  (Pl.'s Resp. Br. at 7.) (Docket No. 29.)  For
   example, plaintiff claimed she could not refill her Orencia
27 prescription because she "didn't have insurance" and it was "like
   4000 dollars a month", (A.R. at 1118), and that the sleep study
28 recommended to her was denied by her insurance.  (See id. at 381).

1   with previous years she was working.  (See id.)

2          On December 5, 2019, Unum notified plaintiff's

3   attorneys of its appeal review and decision rationale and

4   provided them time to respond as they requested.  (See id. at

5   1692-93.)  Plaintiff's counsel responded on January 2, 2020, and

6   argued that Dr. Bartlett's review could not be wholly and

7   uncritically adopted by Unum Life because it was based on

8   isolated events which plaintiff had already explained.  (See id.

9   at 1704-05.)  Unum upheld the decision on appeal by letter dated

10  January 3, 2020, citing the updated medical information and

11  medical review as support for its determination.  (See id. at

12  1710-21.)

13  II.  Discussion

14       A.   Standard of Review

15          ERISA allows a participant or beneficiary to bring a

16  civil action to recover plan benefits.  29 U.S.C. §

17  1132(a)(1)(B); Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108

18  (2008.)  In ERISA actions challenging denials of benefits under

19  29 U.S.C. § 1132(a)(1)(B), "[d]e novo is the default standard of

20  review."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955,

21  963 (9th Cir. 2006) (en banc) (internal citations omitted); see

22  also Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir.

23  1999) (en banc).[5]  The court's entire review, both legal and

24  factual, is de novo.  See Walker v. Am. Home Shield Long Term

25  Disability Plan, 180 F.3d 1065, 1069 (9th Cir. 1999).  When

26  _____

27       [5]   Both parties have stipulated to and the court has
    ordered that the applicable standard of review in this case is de
28  novo. (Docket No. 17.)

1  review is de novo, "the court does not give deference to the

2  claim administrator's decision, but rather determines in the

3  first instance if the claimant has adequately established that he

4  or she is disabled under the terms of the plan." Muniz v. Amec

5  Const. Mgmt. Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010).   The

6  court must "evaluate the persuasiveness of conflicting testimony

7  and decide which is more likely true." See Kearney, 175 F.3d at

8  1095.

9          "Ultimately, under a de novo standard of review, the

10 plaintiff has the burden of proving his or her eligibility for

11 benefits under the terms of the policy by a preponderance of the

12 evidence."   See Hawley v. Life Ins. Co. of N. Am., No. Civ. 08-

13 079 FCD/KJM, 2009 U.S. Dist. LEXIS 69443 (E.D. Cal. June 5, 2009)

14 (Damrell, J.)  The issue this court must therefore address in

15 this case is whether plaintiff has established by a preponderance

16 of the evidence that she was limited from performing the material

17 and substantial duties of her occupation as a staff accountant, a

18 primarily sedentary occupation requiring cognitive skills, when

19 she stopped work on April 28, 2017 and that she remained

20 continuously unable to work throughout the Policy's 180 day

21 elimination Period ending October 24, 2017.  (Def.'s Opening Br.

22 at 1.) (Docket No. 27.); (Def.'s Resp. Br. at 11.) (Docket No.

23 30.)  "The mere existence of an impairment is insufficient proof

24 of disability." Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir.

25 1993).  Plaintiff also "bear[s] . . . the burden of proving that

26 [her] impairment is disabling.  Id.

27      B.   Review of the Evidence

28          Plaintiff complains that it is primarily the fatigue

1   resulting from rheumatoid arthritis and chronic fatigue syndrome

2   which prevents her from returning to work.  (See A.R. at 1282.)

3   The court recognizes that neither fatigue itself nor its severity

4   are readily susceptible to diagnosis by objective testing.

5   Chronic fatigue syndrome "present[s] problems in the world of

6   disability law; for plan administrators who have to determine the

7   weight of a claimant's highly subjective symptoms, and for

8   reviewing courts who ultimately pass over their judgment."  See

9   also Holifield v. UNUM Life Ins. Co. of Am., 640 F. Supp. 2d

10  1224, 1234 (C.D. Cal. 2009) (citing Linich v. Broadspire Servs.,

11  Inc., No. CV-05-2983-PHX-MHM, 2009 WL 775471, at *9 (D. Ariz.

12  Mar. 23, 2009).

13      It is difficult even for health care providers to

14  diagnose chronic fatigue syndrome, as no specific laboratory or

15  biomarkers exist.  Id.  Nevertheless, while there is no test for

16  chronic fatigue syndrome, "there are a variety of tests and

17  evaluations designed to measure an individual's cognitive,

18  psychological, and physical functioning."  Id. at 1237.  The

19  court accordingly begins its review by looking to what there is

20  of that type of objective evidence in this case.

21          1.  Objective Medical Evidence

22      The most relevant objective evidence to assess

23  plaintiff's claims are the test results and examinations by her

24  physicians, with greater emphasis on those immediately before and

25  during the elimination period of April 28, 2017 to October 24,

26  2017.

27      Shortly before the elimination period, in January 2017,

28  Dr. Jamison wrote that plaintiff's rheumatoid arthritis was

1   "reportedly well controlled on leflunomide" and she had no

2   "synovial abnormalities."  (A.R. at 400.)  Dr. Nguyen reported

3   that plaintiff's CDAI was 12 (indicating moderate disease

4   activity) and that she had synovial thickening in her hands and

5   feet but "without significant tenderness."  (Id. at 895.)

6       By July 2017, during the elimination period,

7   plaintiff's CDAI had risen to 22 (the high end of moderate

8   disease activity), but her shoulders, knees, elbows, and ankles

9   were all within normal limits.  (See id. at 892.)  Plaintiff's

10  rheumatologist, Dr. Nguyen, imposed no restrictions or

11  limitations during this period although she had previously

12  reduced plaintiff's hours to 30 hours per week due to "other

13  fatigue." (See id. at 383.)

14      After the elimination period, in December 2018,

15  plaintiff re-established care with Dr. Nguyen and Dr. Nguyen

16  reported that plaintiff "[had a] flare of her rheumatoid

17  arthritis off medication" because she had run out of leflunomide

18  when she lost her insurance and was not on Orencia.  (See id. at

19  1567.)  Nevertheless, her CDAI score had actually gone down

20  slightly to 21.5.  (See id.)  In March 2019, plaintiff began

21  seeing Dr. Huynh and was diagnosed with her highest CDAI score, a

22  27 indicating high disease activity.  (See id. at 1405.)  Just

23  one month later, plaintiff's CDAI score improved to 23 and she

24  was placed back into the category of "moderate disease activity."

25  (See id. at 1402.)

26      While this evidence supports plaintiff's diagnoses of

27  rheumatoid arthritis and chronic fatigue syndrome during the

28  relevant time frame, it does little to confirm her contention

21

that it was disabling.

Plaintiff also saw two sleep specialists regarding her chronic fatigue syndrome immediately before and during the elimination period.  Dr. Malik saw plaintiff three times between December 2016 and July 2017.  In each session, Dr. Malik performed a neurological exam on plaintiff and stated that she was awake, alert, and oriented, that her memory was intact, and that her attention span, concentration, language and fund of knowledge were sufficient.  (See id. at 1028-38.)  Plaintiff's mean sleep latency results from a sleep study with Dr. Malik had improved to 12.2 minutes as compared to 1.4 minutes when she was tested with Dr. Dahi in 2013.  (See id. at 1057-58.)  When plaintiff saw Dr. Shives in October 2017, Dr. Shives observed plaintiff to be alert and oriented.  (See id. at 928.)  Dr. Shives stated that plaintiff's Epworth Sleepiness Scale score was 19.  (See id. at 926.)  Neither Dr. Malik nor Dr. Shives placed any restrictions or limitations during this period.

After the elimination period, plaintiff began treatment with Dr. Dahi again.  In March 2019, Dr. Dahi noted that plaintiff had an Epworth Sleepiness Scale score of 20, that she had an increased Apnea Hypopnea Index of 7.1 events of apnea and hypopnea per sleep hour, diagnosed her again with obstructive sleep apnea, and recommended again that she wear a Continuous Positive Airway Pressure ("CPAP") device to sleep.  (See id. at 1223-24; 1298.)

Again, while the observations of Drs. Malik, Shives, and Dahi are also consistent with a diagnosis of rheumatoid arthritis and chronic fatigue syndrome during the relevant time

22

1    frame, the totality of the objective medical evidence is

2    insufficient to persuade the court that plaintiff's condition

3    rendered her disabled under the terms of the Policy.  The court

4    accordingly turns to the subjective evidence, including

5    plaintiff's symptoms as related to her treating doctors,

6    reviewing consultants, and plan administrators, in evaluating

7    whether plaintiff was capable of performing the regular and

8    substantial duties of her job during the elimination period.

9                    2.   Subjective Medical Evidence

10              Courts "have held it unreasonable to reject Plaintiff's

11   treating/examining physician's notes of Plaintiff's self-

12   reporting and subjective observations, or other assertedly

13   'subjective' evidence, where, as here, . . . . the applicable

14   Plan does not restrict the type of evidence that may be used to

15   demonstrate disability."  Shaw v. Life Ins. Co. of N. Am., 144 F.

16   Supp. 3d 1114, 1128 (C.D. Cal. Nov. 4, 2015.)  As with the

17   objective evidence, the court again places greater emphasis on

18   the subjective medical evidence of plaintiff's complaints

19   immediately before and during the elimination period.

20              Before and during the elimination period, plaintiff

21   consistently told Dr. Jamison that she suffered from profound

22   fatigue which made it difficult to concentrate at work and that

23   she would fall asleep at work.  (See A.R. at 390-402.)  Dr.

24   Jamison stated that plaintiff's chronic fatigue has caused her "a

25   significant amount of debility and inability to work."  (See id.)

26   During the same period, plaintiff also told Dr. Nguyen that her

27   joint tenderness and swelling in her feet and ankles had

28   worsened, that she had increased stiffness in the morning, her

                                    23

1  fatigue was worsening, and she was very tired and sleepy during

2  the day.  (See id. at 892-896.)

3        Plaintiff likewise reported to Dr. Malik that she

4  continued to experienced tiredness during the day, that she would

5  fall asleep at work, that her work was suffering as a result, and

6  that she could not function at work in such a manner.  (See id.

7  1028-38.)  Plaintiff told Dr. Shives that she was experiencing

8  cognitive difficulties, memory loss, word finding difficulties,

9  and a lack of concentration, and continued excessive daytime

10  sleepiness.  (See id. at 925-933.)  Plaintiff also told Dr.

11  Shives that her rheumatoid arthritis pain had worsened but

12  "doesn't necessarily keep her up at night more."  (A.R. at 929.)

13        Ultimately, the three doctors who wrote letters in

14  support of plaintiff's claim for disability, both in the initial

15  review and the appeal, appear to have based their conclusions

16  principally on plaintiff's self-reported symptoms.

17        Dr. Jamison stated that plaintiff was unable to stay

18  awake for more than two hours at a time on an intermittent basis,

19  and could not operate a computer, manage staff, or operate heavy

20  machinery, but provided no clinical rationale for these

21  restrictions and limitations.  (See id. at 48.)

22        Similarly, during the appeal in 2019, Dr. Dahi opined

23  that plaintiff was disabled, stated that plaintiff had long

24  complained of excessive daytime sleepiness and fatigue, and that

25  she reported that this prevented her from working and that he

26  "had no reason to disbelieve her, as these reports can be related

27  to her medical conditions."  (See id. at 1298.)  Dr. Dahi stated

28  that "due to hypersomnia, it seems [plaintiff] has a

deterioration in her cognitive function, accounting, etc." (Id. at 1620-22.)  Dr. Dahi gave no clinical rationale for how he determined that plaintiff's cognitive functioning had deteriorated beyond her reports.

Dr. Huynh stated during the appeal in 2019 that plaintiff "reported inadequate sleep due to pain" and that plaintiff's reports of pain were consistent with her examinations and diagnoses.  (Id. at 1280-81.)

The credibility of the opinions of physicians and the weight to be accorded to those opinions "turns not only on whether they report subjective complaints or objective evidence of disability, but on (1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions."  See Shaw, 144 F. Supp. 3d at 1129.

Dr. Jamison gave no details to support her restrictions and limitations during plaintiff's initial claim, (A.R. at 46-48), and later opined that she was not qualified to say whether plaintiff was disabled or not.  (Id. at 1282.)  Accordingly, the court gives relatively little weight to her opinion despite the fact that she treated plaintiff consistently throughout the elimination period.  Similarly, Dr. Dahi gave no details to support his opinion that plaintiff's cognitive functioning had deteriorated, (see id. at 1622.), and this lack of detail likewise counts against his opinion.  The court also gives less weight to Dr. Dahi and Dr. Huynh's opinions because they were not treating plaintiff during the elimination period.

Ultimately, after reviewing the totality of plaintiff's

medical records, the court is left with scant objective evidence to support plaintiff being disabled under the terms of the Policy during the elimination period.  The medical records which do support plaintiff are based almost entirely on subjective evidence and her self-reported symptoms.

The fact that the medical records which support plaintiff's inability to work are primarily based on self-reported symptoms does not necessarily mean that plaintiff cannot establish that she was disabled under the Policy during the elimination period.  Indeed, the court can imagine a set of circumstances where a plaintiff's subjective complaints alone could be sufficient to carry the burden of persuasion.  However, "the prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate . . . assessment of the claimant's credibility thus becomes exceptionally important in such cases."  See Shaw, 144 F. Supp. 3d at 1128 (citing Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  Therefore, in such circumstances the court must closely scrutinize plaintiff's activities, conduct, and credibility to determine whether they can be reconciled with the subjective evidence of her disability.

3.   Evidence of Plaintiff's Activities and Credibility

Unum argues that plaintiff's activities during the elimination period are incongruous with the reported severity of her symptoms.  (See Def.'s Opening Trial Br. at 11.)  Unum cites that plaintiff took two lengthy road trips during the elimination period from San Diego to Las Vegas and then to Utah "without any difficulty" according to Dr. Jamison's contemporaneous notes.

(A.R. at 393.)   Plaintiff also traveled to Grand Teton National Park in July 2017.  (See id. at 88.)  Plaintiff told Unum that the drive to Utah was 12 hours.  (A.R. at 171.)  The court agrees that these actions are inconsistent with plaintiff's reported symptoms.  If plaintiff were truly unable to stay awake for more than two hours at a time, as Dr. Jamison's restrictions and limitations state, (A.R. 46–48), it is hard to believe that could have driven such distances without great difficulty.

The fact that plaintiff did not always comply with medical advice, also appears incongruous with the reported severity of her symptoms.  "Courts discredit a plaintiff's subjective belief that she is disabled if she refuses treatment or is not diligent in following a treatment plan that could alleviate her symptoms."  See Shaw at 1132.  Failure to comply with treatment plans are "factors to weigh in assessing credibility, and carry more or less weight depending on her diagnosis and her reasons for failing to follow recommended treatments."  See Shaw, 144 F. Supp. 3d at 1133.[6]

Further, although plaintiff was diagnosed with obstructive sleep apnea by Dr. Dahi in 2013 and he recommended that she be treated with a Continuous Positive Airway Pressure

---

[6]    On the other hand, the court does not find that plaintiff's daily routines after the elimination period which involve running a few errands, caring for her grandson a few days a week when he is in school, or attending a cruise for her husband's birthday are "significantly more strenuous than the sedentary staff accounting provision she claims she is unable to perform due principally to fatigue."  (Def.'s Resp. Br. at 7.)  The Ninth Circuit has established that one does not need to be "utterly incapacitated" in order to be disabled.  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001).

1    ("CPAP") device, (A.R. at 304), she told Dr. Nguyen in 2015 that

2    she did not use her CPAP because it hurt her nose.  (<u>See</u> <u>id.</u> at

3    900.)   After resuming treatment with Dr. Dahi again in 2019, Dr.

4    Dahi again recommended that plaintiff use her CPAP device to

5    treat her obstructive sleep apnea.  (A.R. at 1224.)   Both Dr.

6    Dahi and Dr. Malik consistently advised plaintiff about proper

7    sleep hygiene (specifically the importance of avoiding caffeine,

8    smoking, and establishing a regular sleep schedule).  (<u>See</u> <u>id.</u> at

9    250; 1028-37).   While plaintiff always denied caffeine use in her

10   visits with Dr. Malik and Dr. Dahi, (<u>see</u> <u>id.</u> at 1028-1037; 1195),

11   she told Dr. Jamison in March 2018 that she was drinking nearly a

12   gallon of coffee every day to keep her blood sugar up even though

13   she was no longer working at that time.  (<u>See</u> <u>id.</u> at 374.)

14   Plaintiff's behavior in these respects appears to be at odds with

15   the medical advice that she consistently received, and if her

16   condition was as severe as she argues there is no clear rationale

17   in the record for these actions.

18        The record also indicates that plaintiff did not follow

19   up with a referral to a neuropsychologist, participate in a

20   recommended sleep study, or fill prescriptions for recommended

21   medications.   Plaintiff told Unum that she had trouble refilling

22   prescriptions and seeing the recommended doctors because she

23   lacked insurance and could not afford the out of pocket costs,

24   particularly for her rheumatoid arthritis prescription, Orencia.

25   (<u>See</u> Pl.'s Resp. Trial Br. at 7; <u>see</u> A.R. at 1118.)   While this

26   may have been part of the problem, it does not appear to fully

27   explain plaintiff's lack of compliance with her doctor's

28   treatment plans.   Plaintiff told Unum that her insurance was

1   cancelled in May 2018.  (See id. at 952.)  However, when asked by

2   Dr. Nguyen in February 2018 why she had not filled her Orencia

3   prescription from July 2017, plaintiff said it was because she

4   "was out of town and having some problem[s] coordinating with the

5   pharmacy."  (See id. at 889.)

6         Plaintiff was also referred to a neuropsychiatrist in

7   December 2017, Dr. Filoteo, for behavioral issues and to be

8   tested for Attention Deficit Disorder ("ADD"), to see if that

9   could be the cause of her complaints of concentration deficit.

10   (See id. at 384).  When plaintiff saw Dr. Jamison in January

11   2019, she requested a new referral to Dr. Filoteo, and explained

12   that although her insurance did authorize her to see him, she had

13   not yet had a chance to do so before she lost her insurance in

14   May 2018.  (See id. at 1458.)  Plaintiff requested a new referral

15   because she had "4 months to file an appeal with long term

16   disability", (see id. at 1478.), and wanted to "close the gaps"

17   in her care so that she could file the appeal.  (see id. at

18   1475.)  Despite Dr. Jamison giving plaintiff a referral again,

19   plaintiff again did not follow up with Dr. Filoteo or any other

20   neuropsychologist.

21         While the court does not doubt that plaintiff had some

22   issues with her medical insurance, plaintiff also appears to have

23   been less than diligent in following treatment plans that could

24   alleviate her symptoms.  This is not to say that plaintiff should

25   be denied benefits as a sanction for not following medical

26   advice, rather that it casts doubt upon the subjective severity

27   of her condition.  See Shaw, 144 F. Supp. 3d at 1132-1133.

28         In addition, plaintiff's complaints regarding her

symptoms around the time of the elimination period do not appear
entirely consistent with her complaints during the appeals
process.  For example, plaintiff told Dr. Shives just after the
elimination period that "her rheumatoid arthritis pain is worse
at this time but doesn't necessarily keep her up at night more."
(See id. at 929.)  In her medical records of visits with Dr.
Jamison and Dr. Nguyen during the elimination period, plaintiff
never reported that she was unable to sleep due to pain from her
rheumatoid arthritis.  (See id. at 381-401; 889-99.)

Even during the appeal process, after plaintiff had
been off of her rheumatoid arthritis medications and was
experiencing a flare up of her symptoms, Dr. Nguyen described her
pain and fatigue as moderate, and plaintiff did not complain that
she could not sleep because of the pain.  (See id. at 1565.)
However, only a few months later, plaintiff reported to Dr. Huynh
that she "sle[pt] poorly due to her pain."  (See id. at 1404.)
These vacillating explanations cast a negative light on
plaintiff's credibility, particularly since plaintiff was aware
that she had a limited time to file an appeal for her long term
disability benefits when she began seeing Dr. Huynh. (See id. at
1478.)

Unum also noted that plaintiff did not report increased
medical visits prior to leaving her job in April 2017, (Def.'s
Resp. Trial Br. at 8.), or large amounts of sick leave prior to
leaving her post as reasons to doubt the severity of plaintiff's
reported symptoms.  (See A.R. at 220; 745.)  Simply because a
person's condition did not worsen during the relevant time
period, does not mean that they cannot be disabled.  See Hawkins

1  v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918

2  (7th Cir. 2003).  However, the fact that plaintiff did not take

3  large amounts of sick leave casts doubt upon her reports to both

4  Unum and Dr. Jamison where she stated she needed to be on long

5  term disability because "she has to call in [sick] so often

6  because she is too tired to work or has to take a nap."  (See

7  A.R. at 37; 374.)

8       Ultimately, the court finds that plaintiff's activities

9  during the elimination period, her lack of compliance with

10  treatment plans, the shifting explanations for the lack of

11  compliance that she gave to her treating physicians and Unum, and

12  the differing symptoms she reported during the elimination period

13  and the appeals process are inconsistent with the reported

14  severity of her symptoms and cannot be squared with the

15  subjective medical evidence in the record.

16       4.  Narratives Written by Plaintiff and her Husband

17       In addition to her subjective complaints to her doctors

18  in the medical records, plaintiff included with her appeal a

19  narrative statement concerning her symptoms and an explanation of

20  her various trips during the elimination period in addition to a

21  testimonial letter from her husband.  (See id. at 1283-87.)

22  These letters paint a much more dramatic picture of plaintiff's

23  condition than her descriptions in the medical records.

24       While the court is obligated to consider this

25  subjective evidence, see Demer v. IBM Corp. LTD Plan, 835 F.3d

26  893, 904-907 (9th Cir. 2016) (abuse of discretion not to consider

27  a claimant's subjective account of disability), under the

28  circumstances here the court does not find it very persuasive.

1  <u>See</u> <u>Shaw</u>, 144 F. Supp. 3d at 1135–36 (finding "significant

2  potential for bias" in narratives submitted by a claimant, her

3  friends, and her family and cautioning that "subjective evidence

4  of a disabling condition is inherently less reliable than

5  objective evidence.")

6          The descriptions in plaintiff's narrative also at times

7  directly contradict contemporaneous statements plaintiff made to

8  her physicians.  For example, in plaintiff's 2019 narrative, she

9  writes that her drive to Utah in June 2017 took two days because

10  she had to take frequent breaks and that the drive was "scary"

11  because of "brain fog, fatigue and stiffness."  (<u>See</u> A.R. at

12  1284.)  In contrast, when plaintiff described the trip Dr.

13  Jamison in June 2017, she stated that she "was able to drive to

14  Las Vegas and then to Utah without any difficulty."  (<u>Id.</u> at

15  393.)

16          In short, the narratives written by plaintiff and her

17  husband do not compensate for the fact that there is insufficient

18  medical evidence of disability during the elimination period in

19  the record and that plaintiff's self-reported symptoms were at

20  odds with her actions.

21              5.  <u>Unum Reviewing Physicians</u>

22          The court accords little weight to the opinions of Unum

23  clinical representative/ nurse Stacy Bennett, and Unum's on-site

24  physicians Dr. Andrea Brown (M.D. Family Medicine), and Dr. Chris

25  Bartlett (M.D. Family Medicine) inasmuch as they conducted paper

26  reviews and never personally examined plaintiff.  <u>See</u> <u>Montour v.</u>

27  <u>Hartford Life & Acc. Ins. Co.</u>, 588 F.3d 623, 634 (9th Cir. 2009.)

28  Their relationship to Unum also raises questions as to the

1   objectivity of their opinions.[7]   Still, the central issue raised

2   by all of Unum's reviewers is apparent on the face of the

3   treating physicians reports: the medical records do not provide

4   sufficient information or clinical bases for plaintiff's

5   limitations and restrictions, and her activities throughout the

6   elimination period are inconsistent with the reported severity of

7   her symptoms.

8                    6.   Negative SSDI Determination

9              Unum contends that the Social Security Administration's

10   denial of plaintiff's disability claim supports their denial of

11   benefits.   (Def.'s Opening Br. at 28.)   Plaintiff disagrees and

12   notes that the fact that she was awarded disability benefits by

13   the State of California supports her claim.   (Plf.'s Resp. Br. at

14   26.)

15             Although the standards used by various disability

16   benefits programs to determine eligibility vary, the fact that a

17   claimant is found to be entitled to disability "benefits [under

18   ───────────────────────

19          [7]      To the extent that plaintiff objects to the
     qualifications of Dr. Bartlett under ERISA, the court notes that
20   the requirements of 29 C.F.R. § 2560.503-1(h)(3)(iii) are "not so
     demanding that it requires plan administrators to require an
21   expert specific to every unique condition or disease that a
     beneficiary may claim."   Salomaa v. Honda Long Term Disability
22   Plan, 542 F. Supp. 2d 1068, 1080 (C.D. Cal. 2008) (overturned on
     other grounds by Salomaa v. Honda Long Term Disability Plan, 642
23   F.3d 666, (9th Cir. 2011)).   It appears that Dr. Bartlett has
     appropriate training and experience in the field of medicine
24   involved in this case to review plaintiff's file for Unum,
     particularly since many of the key medical records Dr. Bartlett
25   reviewed were from plaintiff's primary care provider, Dr. Jamison
     (M.D. Internal Medicine.)   See also Lee v. Aetna Life & Cas. Ins.
26   Co., No. 05-Civ-2960, 2007 WL 1541009, at *5-6 (S.D.N.Y. May 24,
     2007) (rejecting an argument that an internist was unqualified to
27   review the diagnosis of a rheumatologist).

28

1  one program]. . . suggests that [she] suffers from some

2  limitation on [her] ability to work.  Mossler v. Aetna Life Ins.

3  Co., No. CV 13-01945 SJO (MRWx), 2014 WL 3587511, *16 (C.D. Cal.

4  July 21, 2014).  Thus, the fact that a claimant has qualified for

5  state government disability benefits is properly taken into

6  consideration as evidence of disability but is not determinative.

7  Id.  The converse, however, does not necessarily follow.  The

8  record contains no information as to the reason why plaintiff's

9  disability benefits application to the Social Security

10 Administration was denied.

11      The Ninth Circuit has emphasized that "in some cases,

12 such as this one, the SSA deploys a more stringent standard for

13 determining disability than does the governing ERISA plan."  See

14 Montour, 558 F.3d at 635–36.  Specifically to receive Social

15 Security disability benefits, plaintiff had to show that she was

16 "unab[le] to engage in any substantial gainful activity by reason

17 of a [] medically determinable physical or mental impairment. . .

18 which ha[d] lasted or [was] expected to last for [at least] 12

19 months."  42 U.S.C. §§ 423(d)(1)(A), (d)(5)(A).  Under the

20 Policy, however, plaintiff only had to show that she was unable

21 to perform the material and substantial duties of her regular

22 occupation as a Staff Accountant.  (See A.R. at 134.)

23      Because the bases for both the Social Security

24 Administration's denial of disability benefits and California's

25 granting of disability benefits are not apparent from the

26 administrative record, and because this court has to make its own

27 independent determination, the court assigns no weight to either

28 in determining whether plaintiff was disabled during the

1   elimination period.[8]

2       C.   Conclusion

3           While there can be little doubt that plaintiff suffers

4   from medical conditions that impair her to some degree, there is

5   insufficient evidence to persuade the court that plaintiff was

6   disabled during the elimination period under the terms of her

7   Policy.  See Matthews, 10 F.3d at 680 ("[T]he mere existence of

8   an impairment is insufficient proof of disability.").  Because

9   plaintiff has not carried her burden to establish by a

10  preponderance of the evidence that she was disabled from

11  performing the material and substantial duties of her regular

12  occupation during the elimination period between April 28, 2017

13  to October 24, 2017, IT IS HEREBY ORDERED that Judgment be

14  entered in favor of defendant Unum Life Insurance Company of

15  America in this action.

16  Dated:   December 3, 2020

17                          WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE

18

19

20

21

22

_____

23       [8]     Because the court reviews the evidence de novo to make
    its own findings from the evidence in the record, it does not
24  consider plaintiff's arguments that Unum erred by not requesting
    a functional capacity evaluation and vocational review or
25  agreeing to an independent medical examination of plaintiff.
    (Pl.'s Resp. Trial Br. at 22.)  Moreover, due to the lapse of
26  time before the functional capacity evaluation and vocational
    review were ordered by plaintiff, neither of them supports a
27  finding that plaintiff was disabled during the elimination
    period.

28

                                35